UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
ROSANNE S. PERESS,

                Plaintiff,

    v.

ALLIANCEBERNSTEIN, L.P.,

                Defendant.

---------------------------------------------------------------x

09 CIV 4699

09 Civ.

COMPLAINT

PLAINTIFF DEMANDS
A TRIAL BY JURY

JUDGE CASTEL

    Plaintiff Rosanne S. Peress, by her attorneys, Vladeck, Waldman, Elias & Engelhard, P.C., alleges upon information and belief as follows:

## NATURE OF ACTION

    1.    Plaintiff Rosanne S. Peress ("Peress" or "Plaintiff") brings this action against Defendant AllianceBernstein, L.P. ("AB" or "Defendant"), for declaratory and monetary relief and damages for injuries Plaintiff has sustained as a result of AB's age discrimination against her and AB's retaliation against her for investigating, disclosing and opposing discrimination based on age, race and gender, in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); the New York State Human Rights Law, New York Executive Law § 296 et seq. (the "Executive Law"); and the Administrative Code of the City of New York § 8-107 et seq. (the "City Law").[1]

---

[1] Plaintiff intends to file a charge of discrimination and retaliation with the United States Equal Opportunity Employment Commission (the "EEOC"). When plaintiff receives a Right to Sue Notice, she will seek to amend the Complaint to add claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII") and the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621 et seq. ("ADEA"). The facts set forth are those relevant to those claims as well; therefore, there will be no prejudice to Defendant by this procedure.

259228 v3

## JURISDICTION AND VENUE

2. Pursuant to § 8-502(c) of the City Law, prior to filing this Complaint, Plaintiff served a copy of the Complaint on the City of New York Commission on Human Rights and the City of New York Corporation Counsel.

3. Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1343(4). The Court has supplemental jurisdiction over the claims brought under the Executive Law and the City Law pursuant to 28 U.S.C. § 1367.

4. As the unlawful practices complained of herein occurred within the Southern District of New York, venue is proper in this District pursuant to 28 U.S.C. § 1391.

## PARTIES

5. Plaintiff Peress is 56 years old. She is a citizen of the State of Connecticut. From September 8, 1994 through February 10, 2009, Plaintiff was employed by AB, most recently as the Senior Vice President for Human Resources & Administration.

6. Defendant AB is a global investment management firm that offers research and investment services to clients.

## FACTUAL ALLEGATIONS

### BACKGROUND

7. Plaintiff is a highly respected and successful human resources executive. In 1994, she started working for Alliance Capital, which merged with Sanford Bernstein in 2000 to form AB.[2] She has been considered a top professional in human resources in New York and

---

[2] For ease of reference, Plaintiff uses the term "AB" to refer to AllianceBernstein, L.P., and its predecessors.

in the asset management industry. As a result of her excellent performance, AB routinely rewarded Plaintiff with raises, substantial bonuses and stock options.

8. As of 2009, Plaintiff was responsible for the human resources functions for approximately 5,000 employees in 25 countries and supervised a staff of over 200 employees in AB's Human Resources and Administrative Services groups.

9. Among other duties, Plaintiff was responsible for conducting investigations into employee complaints of discrimination, including complaints of age, race and sex discrimination, and retaliation. A good number of these complaints concerned members of AB's Executive Management, as well as senior employees within the business units supervised by members of Executive Management.

10. As time progressed, some members of Executive Management became increasingly upset at Plaintiff's vigilance in investigating discrimination and retaliation complaints and attempting to ensure compliance with federal, state and city anti-discrimination and anti-retaliation laws.

11. Nonetheless, Plaintiff continued to earn excellent performance reviews. For example, in each year there was a written review, Plaintiff earned outstanding overall ratings. For 2007, Plaintiff received the highest possible rating (a "1") in eight of nine performance categories; on the ninth category she received a "2," which meant she exceeded expectations. For 2008, approximately two months before she was dismissed, Plaintiff received the highest possible rating in all nine performance categories.

12. In her 2008 review, dated December 10, 2008, Plaintiff's manager Gerald M. Lieberman ("Lieberman"), AB's President and Chief Operating Officer, wrote:

> I am going to start this evaluation with a "closing summary;" in short, this was a year of outstanding performance for Rosanne. Her work ethic and effort were above the call. Her execution of

the RIF [Reduction-In-Force] was all-inclusive, thoughtful, efficient and first class. Rosanne "kept her cool" with departing staff members, their managers, and E.C. [Executive Committee] members alike. She was careful to weigh the firm's interest in the short run with its long term interests, while at the same time dealing fairly with all of the parties involved, and she did so with poise.

Rosanne's experience, maturity and drive to do the right thing clearly came through the dark hours of great stress and pressure. As I write this appraisal, well over 550 staff members have left the firm in a matter of weeks . . . The 550+ have been processed by Rosanne and her small team around the globe in a consistently professional manner. . . She seems to be everywhere carrying the conscience of the firm to do the right things and working tirelessly to do the right things the right way.

13.     Shortly thereafter, Peter S. Kraus ("Kraus") became AB's new Chairman of the Board and Chief Executive Officer. Kraus had recently terminated his employment with Merrill Lynch. Less than two months after receiving the highest possible performance score, Kraus fired Plaintiff and told her it was based on feedback from Executive Management and other senior managers. In many instances, those individuals were the same high-level executives to whom Plaintiff had raised issues of discrimination and retaliation. Kraus also told Plaintiff that he had dismissed her because of a reorganization; in fact, Kraus replaced Plaintiff with Lori Massad ("Massad"), AB's 44-year old Chief Talent Officer who had joined the firm less than two years earlier and lacked Plaintiff's qualifications and experience.

PLAINTIFF'S INVESTIGATIONS INTO DISCRIMINATION AND RETALIATION

Mark Mayer

14.     Mark Mayer ("Mayer") was a member of AB's Executive Management. He left the firm voluntarily in early 2009.

15.     In or about the Fall of 2006, Plaintiff learned of potential race discrimination in Mayer's group. Two of Mayer's supervisees wanted to fire an African-

259228 v3                                          4

American Regional Manager for alleged poor performance. The request raised concerns for Plaintiff because the Regional Manager was one of AB's only African-American salespeople out of approximately 100 in the United States. At the time, the Regional Manager was also the third-ranking sales performer in the country. The Regional Manager had not been given any performance warnings, nor had Human Resources been made aware of performance deficiencies. Plaintiff stated that AB should not fire the Regional Manager. After the Regional Manager received a poor performance evaluation, he sent an email stating, in essence, that he was concerned about the reason for his poor evaluation. Given the facts and AB's poor diversity record, Plaintiff reasonably believed that the Regional Manager was complaining about race discrimination and recommended that the firm investigate. She was told not to do so.

16. By 2007, the Regional Manager became the number one sales person in the country. Nonetheless, his problems with Mayer's group persisted and he again complained about race discrimination. Plaintiff investigated and found merit to the claim. Plaintiff suggested that the Regional Manager's direct supervisor be disciplined and/or dismissed. Plaintiff further recommended that AB promote the Regional Manager, guarantee his compensation for 2007 and have him report to a new manager. Mayer, however, was unconcerned about the meritorious charges of race discrimination; rather, he chastised Plaintiff for upsetting the Regional Manager's supervisor.

17. The firm ultimately accepted Plaintiff's recommendation and the Regional Manager was to be relocated. Shortly thereafter, in early 2008, the Regional Manager's new supervisors wanted to fire him because his physical relocation had been delayed. Plaintiff thought this new reason was pretextual given that some white managers supervised sales regions in which they did not reside. Plaintiff again believed the firm wanted to fire the Regional

Manager for discriminatory and retaliatory reasons. As of the date that Plaintiff was fired, the Regional Manager was on a list of employees slated for dismissal.

18. In or about 2007, Plaintiff received a complaint of gender discrimination against the supervisor who had previously been accused of race discrimination, as referenced in paragraph 16 of this Complaint. A female Financial Advisor and working mother was looking for an internal transfer. During an interview for a potential transfer, the supervisor asked the Financial Advisor inappropriate questions suggesting his bias against working mothers; in particular, he asked the female candidate about her marital and family status, her ability to travel, entertain and appear at evening events. The supervisor also stated that the female candidate would have to relocate to Long Island, even though she lived in Manhattan, which is a relatively short commute. During Plaintiff's investigation, the supervisor admitted that he only raised the relocation issue to "test" the female candidate's "commitment." Mayer chastised Plaintiff for accusing the supervisor of sexism.

19. In or about late 2006, Plaintiff learned of potential sexual harassment by another senior executive in Mayer's group. There were allegations that this executive smoked hashish and had sex with one of AB's temporary employees; that he made sexist remarks, such as describing a female employee as wearing "FMPs" ("Fuck-me-pumps"); and that he had an inappropriate relationship with his assistant. Rather than address the executive's conduct, Mayer complained that Plaintiff's investigation and questions had upset the executive. Mayer excused the executive's conduct because, according to Mayer, the executive was "divorced."

20. In late 2006, Plaintiff received a complaint that Mayer and another senior executive in his group were drunk at a bar after a sales conference, had run up a large bill and that the executive starting "hitting on" a junior female employee. Plaintiff brought this incident to Mayer's attention. She also brought to Mayer's attention complaints that the executive would

go out with his staff to meet women and that, on one occasion, a cleaning lady walked in on the executive having sex in the office at 10 p.m. (a female AB employee reporting to Mayer's group was fired for similar conduct). Mayer, however, seemed unconcerned about these potentially serious claims of sexual harassment because, in Mayer's view, the male executive was "single." Instead, Mayer was angry at the employee who complained about the executive, as well as Plaintiff for pursuing an investigation. The executive, who admitted to "kanoodaling" with a friend in the office, was similarly angry at Plaintiff for investigating his conduct.

21.     In or about December 2006, it was reported that a young associate in Mayer's group had been subjected to inappropriate behavior at the firm's holiday party by the same "single" executive. During Plaintiff's investigation, the executive admitted his conduct but claimed he was merely pursuing friendship with the young associate. Plaintiff reminded the executive that as a senior manager it was inappropriate for him to pursue a relationship with a junior employee who was younger than his daughter. Plaintiff reported the executive's conduct to Robert M. Keith and Thomas S. Hexner ("Hexner"), two members of Executive Management.

22.     Upon information and belief, this executive has never been disciplined for his conduct; rather, he has been transferred among several positions and given a sizeable compensation guarantee.

23.     In or about February 2008, Plaintiff discovered information suggesting that another one of the managers reporting to Mayer was having a sexual relationship with one of his direct reports. The two often traveled together and were away from the office for long periods of time. Plaintiff discovered that the supervisee's compensation had increased disproportionately over the last few years. Plaintiff referred the matter to the firm's Audit group, which confirmed the relationship. According to David A. Steyn ("Steyn"), a member of Executive Management, Mayer was angry that Plaintiff had investigated the relationship and

accused Plaintiff of being "prosecutorial" and "judgmental." Steyn accused Plaintiff of embarrassing Mayer because of the investigation she initiated and what it found.

24. In addition to complaints about Mayer's group, Plaintiff also received complaints about Mayer. For example, Mayer and his group had a reputation for hosting wild parties, which included a lot of drinking, costumes and "skits" by Mayer and his employees. At management meetings, Mayer would explain the mission of his group by showing a cartoon of Adolf Hitler stepping on a globe. Upon information and belief, the caption on the cartoon read "World Domination." Plaintiff had to request that Mayer stop using the cartoon because employees found it offensive.

25. Upon information and belief, Mayer was upset at Plaintiff's investigations of discrimination and retaliation and provided Kraus with a negative review of Plaintiff's performance.

Lisa A. Shalett

26. Lisa A. Shalett ("Shalett") is an Executive Vice President, Global Head of Alliance Growth Equities and a member of AB's Executive Management.

27. In or about 2005, a female employee complained about gender discrimination in Shalett's group. The employee alleged that men were given more favorable account assignments and that her co-worker had sexually harassed her. During Plaintiff's investigation into these complaints, the male co-worker acknowledged that AB employees took clients to strip clubs and invited attractive female employees to client dinners to "entertain" male clients. Plaintiff brought these issues to Shalett's attention. On prior occasions when Plaintiff brought similar concerns to Shalett's attention, Shalett made it clear that she was unhappy about the complaints and ensuing investigations. In this instance, Shalett defended the client entertainment practices, claiming that it would be "unfair" to exclude women from these

"opportunities." Plaintiff's investigation led to an internal audit of sales expenses in Shalett's group.

28.     Upon information and belief, Shalett was upset at Plaintiff's investigations of discrimination and provided Kraus with a negative review of Plaintiff's performance.

Laurence E. Cranch

29.     Laurence E. Cranch ("Cranch") is an Executive Vice President, General Counsel and a member of AB's Executive Management.

30.     In or about November 2007, Plaintiff learned of discriminatory remarks made to a female employee in the group supervised by Cranch. A female employee in the Legal and Compliance group complained that two of her co-workers had made discriminatory remarks about her via email. In particular, the two male co-workers joked that the female employee should remain in Hong Kong so that she could be introduced to some "men"; the two co-workers also referred to the female employee as a prostitute. The female employee also complained that her supervisor, who reported directly to Cranch, retaliated against her for bringing the discriminatory emails to his attention. Plaintiff protested to Cranch that this discriminatory and retaliatory behavior was unacceptable. Cranch, however, alleged that the female employee was "unstable" and "had to leave." Moreover, when Cranch learned that Plaintiff had started an investigation, he falsely accused Plaintiff of violating the firm's email policy.

31.     Upon information and belief, Cranch was upset at Plaintiff's investigations of discrimination and retaliation and provided Kraus with a negative review of Plaintiff's performance.

Gregory Tencza

32.     Gregory J. Tencza ("Tencza") is an Executive Vice President, Head of Institutional Investments and a member of AB's Executive Management.

259228 v3                                                              9

33. In or about mid-2008, Plaintiff learned of potential sexual harassment in Tencza's group. A young female complained that her male supervisor had behaved inappropriately; in particular, the supervisor would talk to the young female employee about personal issues for hours and arranged to leave early on a business trip so that he could spend time with her alone. The supervisor also inappropriately billed these expenses to the firm. Plaintiff recommended the supervisor's dismissal because the supervisor had engaged in similar behavior in the past and had already been placed on a final warning. Tencza was angry at Plaintiff's investigation and her recommendations. Ultimately, Tencza's view prevailed and the supervisor was given another "final warning." Shortly thereafter, the female employee complained that the supervisor was retaliating against her for her complaint of sexual harassment.

34. Upon information and belief, Tencza was upset at Plaintiff's investigations of discrimination and retaliation and provided Kraus with a negative review of Plaintiff's performance.

Thomas S. Hexner

35. Hexner is an Executive Vice President, Head of Bernstein Global Wealth Management and a member of AB's Executive Management.

36. In or about the Fall of 2008, Plaintiff learned of potential race discrimination in Hexner's group. Hexner wanted to fire for poor performance one of only two African-American Financial Advisors in the country. Although the Financial Advisor had been rated poorly for a few years, Plaintiff noticed that a white peer had more serious performance issues, yet Hexner had not even placed the white peer on a performance warning. When Plaintiff raised this obvious double standard to Hexner, Hexner responded that it was "not just about production." Hexner further complained that Plaintiff was causing "morale problems" and that

259228 v3                                                    10

senior executives at AB should be permitted to fire Financial Advisors at will. Hexner ultimately prevailed and fired the African-American Financial Advisor.

37. Upon information and belief, Hexner was upset at Plaintiff's investigations of discrimination and provided Kraus with a negative review of Plaintiff's performance.

Discriminatory Assignment of Accounts to Female Financial Advisors

38. AB Financial Advisors recommend and sell various financial products to AB's customers. Each Financial Advisor's performance is measured by the amount of assets the Financial Advisor has under management, commonly referred to as the Financial Advisor's "book" of business. A Financial Advisor with a large "book" will generate more commissions and thus be better compensated.

39. AB Managers have the discretion to assign customer accounts to the Financial Advisors. This often occurs when a Financial Advisor leaves the firm. The departing Financial Advisor's "book" is broken up and redistributed to his or her peers.

40. Since in or about 2004, Plaintiff learned of a number of complaints by female Financial Advisors that AB managers distributed customer accounts in a discriminatory manner. In particular, Plaintiff learned of a number of instances where it appeared that male Financial Advisors were given a disproportionate share of a departing Financial Advisor's "book."

41. In or about mid-2008, Plaintiff pressured AB's Private Client group to alter its account distribution policies to make them gender neutral.

Plaintiff's Concerns About the Firm's Hiring and Retention Practices

42. During her employment, Plaintiff expressed her concerns about the lack of diversity among AB's employees. For example,

    a. there were only approximately five (out of about 300) African-American executives with the title of Senior Vice President and above; two of those had complained about race discrimination;

    b. there were few, if any, Hispanic senior executives;

    c. there were few, if any, Asian senior executives (excluding AB's offices in Asia);

    d. the Value Research Group had no African-American or Hispanic researchers (out of approximately 70);

    e. there were only approximately two African-American and approximately 30 female Financial Advisors (out of approximately 300); and

    f. upon information and belief, there were few, if any, female, African-American, Asian or Hispanic salespeople (out of approximately 75 to 80) in AB's Retail Sales group.

43. AB's poor diversity numbers were of great concern to Plaintiff, especially when she started to learn of the complaints of race and sex discrimination listed above, among others.

44. Plaintiff's concerns were exacerbated by remarks made by members of AB's Executive Management. For example, in or about 2007, a member of Executive Management stated that she had "not bought into the whole working mother thing" and that working mothers "are not happy at home or at the office." This executive further stated that any mention of the term "Affirmative Action" made her "blood boil." Another member of Executive Management referred to Asian analysts as a "PuPu Platter."

45. In or about 2008, one of AB's business units wanted to use a standardized test to screen certain job applicants. Plaintiff investigated the proposed test and found that it did

not evaluate properly the applicants' relevant job skills. To the contrary, Plaintiff discovered that there was an inverse relationship between test scores and job performance. Plaintiff opposed the use of this non-validated test because it could have an adverse impact on minority candidates. AB rejected Plaintiff's warning.

46. Plaintiff made her concerns about discrimination known to members of Executive Management.

The Dismissal of African-American Assistants in Late 2008

47. In late 2008, AB implemented a reduction-in-force ("RIF") of a substantial portion of its workforce. Plaintiff reviewed each of the dismissals.

48. Upon conducting her review, Plaintiff noticed that of approximately 100 support staff employees in the New York office, the firm had scheduled for dismissal four of the five African-Americans in the Private Client group. Ultimately, AB also fired the fifth African-American assistant. There were no white support staff employees recommended for dismissal.

49. Plaintiff expressed her concerns to senior executives that these employment decisions demonstrated a pattern of the firm not only failing to hire African-American employees, but also failing to provide adequate support so that African-Americans could succeed. Without conducting any investigation, Plaintiff was told that the employment decisions were based on objective performance reviews and that the race of the dismissed employees was merely a "coincidence."

PLAINTIFF'S EXCELLENT PERFORMANCE REVIEW AND SUBSEQUENT DISMISSAL

50. As explained above, on December 10, 2008, Plaintiff received the best possible rating on her annual performance review, having earned the highest possible score in all nine performance categories.

51. On December 19, 2008, Plaintiff learned that Kraus had been hired as the new CEO of the firm.

52. Over the next two months, Plaintiff had little, if any, substantive interaction with Kraus.

53. During this same period, Kraus directed Executive Management to complete a "forced ranking" of all AB employees earning over a certain amount. Upon information and belief, the "forced rankings" were used to identify employees for job elimination. Despite her role as AB's most senior human resources executive, Plaintiff was excluded from this process.

54. Plaintiff was nonetheless able to review some documents concerning the upcoming layoffs. She also spoke to Massad who identified some of the employees likely to be fired. Plaintiff expressed her concerns about the number of proposed dismissals of older employees.

55. Shortly thereafter, on February 10, 2009, Kraus fired Plaintiff. Kraus did not mention any specific performance deficiencies; to the contrary, he stated that Plaintiff achieved good results. According to Kraus, however, the company was reorganizing the Human Resources department and Plaintiff did not have the support of Executive Management. These were the same managers Plaintiff had investigated for discriminatory and retaliatory practices in the past.

56. Kraus replaced Plaintiff with Massad and made Massad a member of Executive Management. Massad is 12 years younger than Plaintiff and lacks Plaintiff's qualifications and experience.

## FIRST CAUSE OF ACTION

### Retaliation in Violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981

57. Plaintiff repeats and realleges paragraphs 1 to 56 of this Complaint as if fully set forth herein.

58. Section 1981 prohibits retaliation for a person's opposition to race discrimination in the making, enforcement, performance, modification, and termination of contracts, including employment contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

59. Plaintiff opposed Defendant's racially discriminatory practices by the conduct described above.

60. Defendant's decision to terminate Plaintiff's employment constituted retaliation in violation of Section 1981.

61. Defendant engaged in its retaliatory actions with malice and with reckless indifference to Plaintiff's federally protected rights.

62. Defendant's actions described above directly and proximately have caused, and continue to cause, Plaintiff to suffer loss of income and other financial benefits, a loss of future professional opportunities and future income, anguish, pain and suffering, humiliation, indignity, personal embarrassment, and damage to her professional reputation.

## SECOND CAUSE OF ACTION

### Age Discrimination Under the Executive Law

63. Plaintiff repeats and realleges paragraphs 1 to 62 of this Complaint as if fully set forth herein.

64. By the acts and practices described above, Defendant has discriminated against Plaintiff in the terms and conditions of her employment on the basis of her age, in violation of the Executive Law.

65. Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish and humiliation as a result of Defendant's discriminatory acts.

### THIRD CAUSE OF ACTION

### Retaliation Under the Executive Law

66. Plaintiff repeats and realleges paragraphs 1 to 65 of this Complaint as if fully set forth herein.

67. By the acts and practices described above, Defendant has retaliated against Plaintiff in violation of the Executive Law.

68. Plaintiff is now suffering irreparable injury and monetary damage from Defendant's retaliatory conduct and will continue to do so unless and until the Court grants relief.

### FOURTH CAUSE OF ACTION

### Age Discrimination Under the Administrative Code

69. Plaintiff repeats and realleges paragraphs 1 to 68 of this Complaint as if fully set forth herein.

70. By the acts and practices described above, Defendant has discriminated against Plaintiff in the terms and conditions of her employment on the basis of her age, in violation of the Administrative Code.

71. Defendant acted with malice and/or reckless indifference to Plaintiff's statutorily protected rights.

72. Plaintiff is now suffering irreparable injury and monetary damage from Defendant's discriminatory conduct and will continue to do so unless and until the Court grants relief.

### FIFTH CAUSE OF ACTION

#### Retaliation Under the Administrative Code

73. Plaintiff repeats and realleges paragraphs 1 to 72 of this Complaint as if fully set forth herein.

74. By the acts and practices described above, Defendant has retaliated against Plaintiff in violation of the Administrative Code.

75. Defendant acted with malice and/or reckless indifference to Plaintiff's statutorily protected rights.

76. Plaintiff is now suffering irreparable injury and monetary damage from Defendant's retaliatory conduct and will continue to do so unless and until the Court grants relief.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter an award:

(a) declaring that the acts and practices complained of herein are in violation of Section 1981, the Executive Law and the Administrative Code;

(b) enjoining and permanently restraining these violations of Section 1981, the Executive Law and the Administrative Code;

(c) directing Defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect Plaintiff's employment opportunities;

(d) directing Defendant to reinstate Plaintiff to the position she would have occupied but for Defendant's unlawful conduct and making her whole for all earnings she would

have received but for Defendant's unlawful conduct, including, but not limited to, wages, pension, 401(k) contributions, bonuses and other lost benefits;

   (e) directing Defendant to pay Plaintiff punitive damages;

   (f) directing Defendant to pay an additional amount to compensate Plaintiff for the emotional distress and reputational damage Defendant's unlawful conduct has caused Plaintiff;

   (g) awarding Plaintiff such interest as is allowed by law;

   (h) awarding Plaintiff her reasonable attorneys' fees and costs; and

   (i) granting such other and further relief as the Court deems necessary and proper.

DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, a trial by jury in this action.

Dated: New York, New York
   May 19, 2009

            VLADECK, WALDMAN, ELIAS
              & ENGELHARD, P.C.

      By: *Anne Vladeck*
         Anne C. Vladeck
         Valdi Licul
         Attorneys for Plaintiff
         1501 Broadway, Suite 800
         New York, New York 10036
         (212) 403-7300